FILED
2016 MAY 26 PM 1:00
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**CASE UNSEALED PER ORDER OF COURT**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

January 2016 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 16CR1206 JLS |
| Plaintiff, | I N D I C T M E N T |
| v. | Title 18, U.S.C., Sec. 371 - Conspiracy To Commit Bribery; Title 18, U.S.C., Sec. 981(a)(1)(c), and Title 28, U.S.C., Sec. 2461(c) - Criminal Forfeiture |
| MICHAEL GEORGE BROOKS, | |
| Defendant. | |

The grand jury charges that at all time material:

**INTRODUCTORY ALLEGATIONS**

1. From in or about June 2006 to July 2008, defendant MICHAEL GEORGE BROOKS ("BROOKS") was a Captain in the United States Navy serving as the United States Naval Attaché ("NATT") at the United States Embassy in Manila, Philippines. In this position, BROOKS served as the representative of the Secretary of Defense, the Chairman of the Joint Chiefs of Staff, and the United Forces of the United States in Manila and also as the military advisor to the United States Ambassador. As part of his official duties, BROOKS interacted with the Subic Bay Metropolitan Authority ("SBMA"), the Philippine government agency with broad authority over the industrial affairs of

MWP:nlv:San Diego:5/26/16

Subic Bay, Philippines. BROOKS retired from the U.S. Navy as a Captain in November 2011 and since approximately that time has been employed as a contractor for the Defense Threat Reduction Agency ("DTRA") in Northern Virginia.

2. As a Captain in the United States Navy, BROOKS was a "public official" within the definition of Title 18, United States Code, Section 201(a)(1).

3. Leonard Glenn Francis ("Francis") (charged elsewhere) was a citizen of Malaysia, residing in Singapore. Francis was the owner, Chief Executive Officer, and President of Glenn Defense Marine (Asia) ("GDMA"), a multi-national corporation with headquarters in Singapore. As of September 2013, GDMA had operating locations in many countries, including Japan, Thailand, Malaysia, Korea, Hong Kong, Indonesia, Australia, Philippines, and the United States. GDMA provided husbanding services to the U.S. Navy under a variety of husbanding contracts for over 25 years. "Husbanding" involved the coordinating, scheduling, and direct and indirect procurement of items and services required by ships and submarines when they arrived at port.

4. HP, a citizen of the United States, was GDMA's Vice President of Corporate Affairs.

5. NP, a citizen of Malaysia and resident of Singapore, was GDMA's Vice President of Global Operations.

6. The offense described herein began and was committed out of the jurisdiction of any particular district, and the last known residence of one or more joint offenders therein is within the Southern District of California.

//
//

## Count 1

### Conspiracy (18 U.S.C. § 371)

7.  From in or about December 2006 until in or about September 2013, on the high seas and out of the jurisdiction of any particular district, defendant MICHAEL GEORGE BROOKS, a public official, Leonard Francis, HP, NP, and others (1) knowingly and unlawfully combined, conspired, and agreed to commit bribery; that is, BROOKS, Francis, HP, NP, and others knowingly agreed that, in return for BROOKS being influenced in the performance of official acts and in return for BROOKS being induced to do and omit to do acts in violation of his official an lawful duties, as opportunities arose (a) Francis, HP, NP, and others directly and indirectly, corruptly gave, offered, and promised things of value to BROOKS, including but not limited to travel and entertainment expenses, the services of prostitutes, and hotel rooms; and (b) BROOKS would directly and indirectly, corruptly demand, seek, receive, accept, and agree to receive and accept these things of value; and (2) BROOKS and Francis took overt acts in furtherance of this conspiracy and to effect its unlawful object, in violation of Title 18, United States Code, Sections 201(b)(1)(A) and (C), and 201(b)(2)(A) and (C).

### OBJECT OF THE CONSPIRACY

8.  It was the object of the conspiracy for BROOKS to corruptly use his position and influence in the U.S. Navy to advocate for and advance GDMA's interests, as opportunities arose, by, among other things, providing Francis and others with internal, proprietary U.S. Navy information; obtaining diplomatic clearance for GDMA to operate in the Philippines; advocating against the interests of GDMA's competitors; and allowing GDMA to ghostwrite U.S. Navy documents and

correspondence directly affecting its interests, and in return, Francis and others would corruptly give things of value to or on behalf of BROOKS, including but not limited to travel and entertainment expenses, the services of prostitutes, and hotel rooms.

## METHODS AND MEANS OF THE CONSPIRACY

9. In furtherance of this conspiracy, and to accomplish its object, the following methods and means were used, among others:

   a. BROOKS would corruptly demand, seek, receive, and accept things of value from Francis and others.

   b. Francis and others would corruptly offer and give things of value to or on behalf of BROOKS, including travel and entertainment expenses, hotel rooms, and the services of prostitutes.

   c. In return for these things of value, BROOKS would use his position and influence in the U.S. Navy to advocate for and advance GDMA's interests, as opportunities arose.

   d. BROOKS would provide Francis and others with internal, proprietary U.S. Navy information and documents.

   e. BROOKS would obtain diplomatic clearance for GDMA to operate unfettered in the Philippines.

   f. BROOKS would allow GDMA to ghostwrite U.S. Navy documents and correspondence directly affecting its interests.

   g. BROOKS, Francis, and others would use coded terminology, personal email accounts, and other means designed to obscure the true nature of their corrupt relationship and to avoid detection by law enforcement, including referring to prostitutes as "shakes," "chocolate shakes," "MOCHA shakes," and "high tea."

//
//

4

## OVERT ACTS

10. In furtherance of the conspiracy and to effect its objects, the following overt acts, among others, were committed:

   a. On or about December 19, 2006, via e-mail addressing Francis as "Boss," BROOKS thanked Francis for a lunch, forwarded Francis a U.S. Navy ship schedule, and began working with Francis to promote aggressively GDMA to SBMA.

   b. On or about January 11 and January 12, 2007, BROOKS forwarded Francis an e-mail which contained internal official U.S. Navy correspondence about an upcoming U.S.S. Blue Ridge visit to the Philippines. The e-mail contained concerns regarding the fact that a GDMA competitor had filed a protest with the U.S. Government Accountability Office ("GAO") over GDMA's award of a December 2006 U.S. Navy husbanding contract. One U.S. Navy official copied on the e-mail expressly directed recipients of the e-mail not to share the information "with anyone outside of the government or who do not have a need to know." BROOKS responded to U.S. Navy officials, blind copying (bcc'ing) Francis on the response, arguing that GDMA's contract performance should be allowed to continue notwithstanding the competitor's protest. On or about February 27, 2007, citing his position as NATT with the USDAO, BROOKS formally requested and received from GAO a copy of GAO's official decision dismissing the protest, which BROOKS then forwarded to Francis.

   c. Shortly thereafter, BROOKS e-mailed a flight itinerary to Francis for a trip that he and his family were taking to Phuket, Thailand from March 30, 2007 to April 4, 2007. In a March 20, 2007 e-mail chain, Francis and a GDMA employee, YPS, discussed BROOKS's trip. Francis noted that while BROOKS would be paying for his own hotel

5

during the trip, "You [YPS] may have a big budget for them as they are important client." YPS responded that she would prepare gifts and "If you said 'Big Budget' I suggest we can responsible for all trips and dinners." Francis agreed and instructed YPS to proceed and to coordinate further with BROOKS. GDMA employees then exchanged e-mails stating, "[P]lease prepare cash budget on hands for me [YPS] to support VIP trip in Phuket during 30th Mar - 4th Apr. There are 4 guests and me [YPS]."

   d. Following the completion of the trip, YPS sent Francis an e-mail with the subject line "Budget Summary......Capt.Brooks Family Tour in Phuket, Thailand." The employee asked Francis, "kindly note on these spent items for entertain our VIP in Phuket during 30 Mar - 4 Apr." In response, Francis wrote, "Well done [YPS], they are very pleased."

   e. On or about May 20, 2007, BROOKS asked Francis, "I have the 'thank you' letter. What else do I owe you?" Francis replied, "Ships sceds, MSC note to shift from Subic, to Manila. Admiral Mayugas present job. Your E.T.A. HERE Thanks[.]"

   f. On or about May 24, 2007, BROOKS forwarded Francis a ship schedule of an upcoming port visit and the two then discussed the "need [for] a Choc shake booster" and "MOCHA shake."

   g. On or about May 24, 2007, in an e-mail chain with the subject line: "Food Orders," Francis wrote to NP, "Cut off all the past emails below when you send to the above. I do not want [a U.S. Navy official] to know that I am in comms with Capt Brooks. Be Carefull as we are surrounded by vipers."

   h. On or about May 22, 2007, BROOKS and Francis exchanged e-mails - with BROOKS writing from his personal Yahoo e-mail account -

6

in which BROOKS told Francis he would try to arrange quarterly diplomatic clearances for all GDMA vessels entering the Philippines. In response, Francis wrote, "I will definitely make it up to you when I am in Manila soon." Using his official authority as NATT, BROOKS, in fact, secured the quarterly diplomatic clearances for GDMA vessels. These clearances allowed all GDMA vessels to transit into and out of the Philippines under the diplomatic imprimatur of the U.S. Embassy. The clearances also limited the amount of customs fees and taxes GDMA was required to pay and allowed GDMA to transport any quantity or type of cargo it chose because its vessels were not subject to inspection, and further allowed GDMA to bring armed guards into Philippine waters.

  i. Shortly thereafter, on or about May 26, 2007, a family member of BROOKS enjoyed the services of a stretch limousine, paid for by Francis.

  j. On or about July 22, 2007, Francis wrote to BROOKS: "We would appreciate your assistance to send a note to the Chairman and Attorney of SBMA that the US Embassy views [a GDMA-competitor's allegedly unprofessional] behavior with great concern and will stop sending ships to Subic if this continues." BROOKS forwarded correspondence (drafted by GDMA employees) to a U.S. Navy official in Manila. The correspondence described how the competitor was allegedly interfering with GDMA's ability to provide husbanding services to U.S. Navy ships.

  k. After BROOKS informed Francis that the correspondence had been forwarded to a U.S. State Department official, Francis instructed BROOKS to forward the correspondence to more senior officials: "[The U.S. State Department official] is way down the chain to action this issue. We need to send a formal complaint to

[more senior officials]." BROOKS responded to Francis: "Boss, I am still going to send a letter to SBMA. [The U.S. State Department official] spoke to FISC today and let them now [sic] what transpired in Subic. I am going to also brief [a more senior official] during his visit to Manila 7 August. Thanks."

    l. On or about July 28, 2007 until on or about August 1, 2007, GDMA paid for BROOKS's hotel stay at The Valley Wing, Shangri-La Hotel in Singapore. On the hotel reservation, signed by a GDMA employee, an entry was made stating, "ALL CHARGE TO COMPANY," at a rate of $580.00 SGD per night.

    m. On or about November 27, 2007, HP ghostwrote an official U.S. Navy contractor evaluation and transmitted the completed evaluation to Francis. In transmitting the evaluation to Francis to relay to BROOKS, HP wrote: "Evaluation completed. It is extremely important that the attached file be saved again and renamed by Captain Brooks to erase document statistics."

    n. On or about November 28, 2007, Francis forwarded the contractor evaluation completed by HP to BROOKS with the same admonishment: "It is extremely important that the attached file be saved again and renamed . . . to erase document statistics."

    o. On or about November 29, 2007, BROOKS submitted to the U.S. Navy the contractor evaluation, completed by HP and GDMA. As submitted, the GDMA-drafted evaluation read: "GDMA's unsurpassed husbanding support in the Philippines this past year provided an exceptional husbanding capability never before experienced in the Philippines. While previous husbanding contractors struggled to perform in seemingly routine locations, GDMA delivers world class service in any location, and has become an integral piece of the

Ambassador's U.S. Navy engagement strategy. Accordingly, GDMA has my, as well as [the U.S. Ambassador to the Philippines'], strongest recommendation for future husbanding contract awards in the Philippines."

   p. Also on or about November 29, 2007, Francis forwarded to HP and NP the e-mail wherein BROOKS transmitted the GDMA-completed contractor evaluation form to the U.S. Navy. Francis wrote to HP and NP: "We are looking great."

   q. In or about November 2007 and December 2007, GDMA drafted language for correspondence for BROOKS to send to U.S. Navy officials concerning alleged problems U.S. Navy ships in the Philippines had experienced with refueling contractors. BROOKS forwarded U.S. Navy responses and internal discussion to Francis.

   r. On or about January 4, 2008, BROOKS forwarded to Francis an incumbent refueling contractor's internal information regarding the USNS Niagara Falls's port visit on January 7, 2008.

   s. Nearly simultaneously, on or about January 6, 2008, BROOKS sent an e-mail to Francis and asked, "Boss, Are you planning on going to your office after you arrive? I am trying to arrange 'high tea'. I saw your text that you plan on departing at 1400 on Tuesday [January 8, 2008]. I may require the room for a little bit longer. We will discuss when you arrive. Cheers." Francis's American Express statement from January 2008 indicated two separate charges for January 8, 2008 at the Hyatt Manila Bay Hotel & Casino in the amount of $3,240.10 and $148.79 Singapore dollars.

   t. Beginning on or about May 25, 2008, Francis hosted a days-long party for U.S. Navy Officers during a port visit to Manila by the USS Blue Ridge with alcohol, prostitutes, and lavish hotel

1 accommodations, among other luxuries. During this days-long party in
2 the Presidential Suite at the Makati Shangri-La, BROOKS attended
3 around the end of each day, accompanied by a prostitute.

    u. On or about May 4, 2009, BROOKS wrote: "Boss, Do they serve Chocolate shakes in Singapore? See you soon."

    v. On or about May 21, 2009, BROOKS e-mailed Francis and wrote: "Boss, It was good to see you. Look forwad [sic] to seeing you in DC." Brooks followed up with an e-mail to Francis, subject line "PS": "Should have asked for more booster. Cheers".

    w. On or about February 25, 2010, BROOKS e-mailed Francis and wrote: "Boss, I am trying to change my flight to tomorrow morning. I never did get a chance to meet [a prostitute]. I stopped by the club she worked at and all she wanted me to do was buy her some drinks - working girl through and through."

    x. On or about October 26, 2012, BROOKS sent Francis a message via LinkedIn inquiring about whether GDMA was supporting a then-occurring U.S. Navy ship visit in Manila.

All in violation of Title 18, United States Code, Section 371.

### FORFEITURE ALLEGATIONS

11. The allegations set forth in Count 1 of this Indictment are incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(c), and Title 28, United States Code, Section 2461(c).

//
//
//
//
//

12. Upon conviction of the offense set forth in Count 1 defendant MICHAEL George BROOKS shall forfeit to all property, real and personal, which constitutes or is derived from proceeds traceable to Count 1 pursuant to Title 18, United States Code, Section 981(a)(1)(c), and Title 28, United States Code, Section 2461(c), including but not limited to a money judgment in an amount not less than the proceeds of the offense set forth in Count 1.

DATED: May 26, 2016.

A TRUE BILL:

_____
Foreperson

LAURA E. DUFFY
United States Attorney

By: _____
MARK W. PLETCHER
PATRICK HOVAKIMIAN
Assistant U.S. Attorneys

ANDREW WEISSMANN
Chief, Fraud Section
Criminal Division

By: _____
BRIAN R. YOUNG
Assistant Chief
Fraud Section, Criminal Division

11